IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 09-cv-02369-MSK-KMT

MADISON SERVICES COMPANY, LLC, n/k/a M Capital Services, LLC, a Delaware corporation,

        Plaintiff/Counter-Defendant,

v.

JOHN GORDON, an individual,

        Defendant/Counter-Claimant.

---

## OPINION AND ORDER GRANTING IN PART MOTION FOR JUDGMENT ON THE PLEADINGS AS TO THE FEDERAL CLAIMS AND DECLINING JURISDICTION OVER REMAINING STATE LAW CLAIMS

---

**THIS MATTER** comes before the Court on Plaintiff/Counter-Defendant Madison

Services Company, LLC's ("Madison") Motion for Judgment on the Pleadings (**#184**) and

supplement/amendment (**#221**), to which Defendant/Counterclaimant John Gordon responded

(**#246**), and Madison replied (**#275**).  Having considered the same, the Court **FINDS** and

**CONCLUDES** the following.

### I.  Jurisdiction

The Court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  As noted

below, this action is the second lawsuit brought to resolve the dispute between Mr. Gordon and

Madison. The first was initiated by Mr. Gordon in Colorado state court.  The Court has had no

recent update as to that action, but assumes it to be pending.

In this action, the claims and counterclaims are mirror images of each other.  Some arise

1

under state law and others arise under, or may be, preempted by federal law, specifically the

Employee Retirement Securities Act ("ERISA").  These federal claims are all premised on the

administration of Madison's Key Employee Incentive Plan (the "Plan"), which is governed by

ERISA.  For ease of reference, the claims and counterclaims are summarized below:

| Claims that are or may be governed by ERISA | Claims governed by Colorado law |
|---|---|
| Claim 1: A declaration that the Colorado Wage Act is inapplicable to the Plan because it is preempted by ERISA | Counterclaim 1: Wrongful termination |
| Claim 2: A declaration that Mr. Gordon failed to meet the condition precedent to payment under the Plan (signing a general release) | Counterclaim 2: Breach of implied contract based on Madison's termination policies |
| Claim 3: A declaration that Madison's 2008 and 2009 contributions to the Plan on behalf of Mr. Gordon have not vested | Counterclaim 5: Theft (a derivative claim on behalf of an investment corporation owned and controlled by Madison) |
| Counterclaim 3: Breach of contract based on Madison's failure to pay benefits to Mr. Gordon under the Plan | Counterclaim 6: Aiding and abetting a breach of fiduciary duty (a derivative claim on behalf of an investment corporation owned and controlled by Madison) |
| Counterclaim 4: Violation of the Colorado Wage Act based on Madison's failure to pay benefits to Mr. Gordon under the Plan | Counterclaim 7: Extreme and outrageous conduct |

This opinion concerns only those claims that are or may be governed by ERISA, and accordingly

is based upon a review of the administrative record and arguments of the parties.  Thus, the

Court bifurcates determination of the claims arising under ERISA pursuant to Fed. R. Civ P.

42(b).

## II.   Issue Presented

The issues raised are (i) whether ERISA preempts Mr. Gordon's claim brought pursuant

2

to Colorado Wage Act for benefits under the Plan (Claim 1 and Counterclaim 4); and (ii)

whether the Plan Administrator's determination that Mr. Gordon was not entitled to benefits

under the Plan after his separation from Madison was arbitrary and capricious (Claims 2 and 3

and Counterclaim 3).

### III.   Material Facts

The Court  finds the material facts to be as follows.

Mr. Gordon began his employment with Madison in 1999 and served in various

capacities until his employment was terminated in June 2009.  Mr. Gordon's duties included

accounting and the preparation of Madison's corporate tax returns.  During his employment, Mr.

Gordon participated in Madison's Key Employee Incentive Plan, a deferred compensation plan

for certain key employees.

By its terms, the Plan is governed by ERISA.  *See* Key Employee Incentive Plan,

Introduction, filed as **#32-1** (hereinafter cited as "Plan;" all references to subsections in the Plan

can be found at Docket No. **32-1**).  Greatly summarized, the Plan provides benefits to Madison's

key employees (Participants), including Mr. Gordon.  Under the Plan,  Madison made

contributions on behalf of the Participants, and the Participants could also make contributions.

When a Participant left Madison's employ, the Plan would pay the Participant all vested

amounts, if the Participant executed and delivered a "General Release" within a specified time

period.

The Plan expressly empowers the "Plan Administrator" to administer the Plan,  to

interpret and enforce the Plan terms, to decide questions and disputes about the Plan, to supply

omissions, and to resolve inconsistencies and ambiguities arising with the Plan or between the

Plan and other documents.  *See* Plan § 7.02(a).  It also gives the Plan Administrator "the authority and discretion to decide claims for benefits and appeals to denials of claims."  *See* Plan § 7.02(f).[1]  The Plan also provides:

> The Plan Administrator shall have full discretionary authority in all matters related to the discharge of its responsibilities and the exercise of authority under the Plan, including, without limitation, the construction of the terms of the Plan, and the determination of eligibility for coverage and benefits.  The decision of the Plan Administrator shall be conclusive and binding upon all persons having or claiming to have any right or interest in or under the Plan and no such decision shall be modified under judicial review unless the decision is proven to be arbitrary or capricious.

*See* Plan § 8.07.

Upon a "Termination Event,"[2] an employee is entitled to a distribution of his or her interest in the Plan.  *See* Plan § 5.02.  After describing the distribution and manner of valuation of a participant's interest, section 5.02 states that "In return and as a condition precedent to the Plan's obligation to make any cash settlement, the Participant shall provide the Plan, the Trust and the Company with an executed General Release."  The definition of General Release in section 1.24 further explains:

> Each Participant will be given a period of twenty-one (21) calendar days after receipt of the General Release within which to consider its waiver, release and covenant terms and to consult with an attorney.  The Participant then has a period of seven (7) calendar days following the date of execution of the General Release to revoke it. The General Release shall not become effective or enforceable until the seven (7)

---

[1] The Plan Administrator was Bryan Gordon, Managing Director of Madison Capital Management, LLC, which is the Managing Member of Madison.  For ease of reference, the Court shall refer to Mr. Bryan Gordon as the "Plan Administrator" throughout this Order.

[2] For purposes of this dispute, a Termination Event is defined as a "Termination from Employment" for any reason whatsoever.  *See* Plan § 1.39(b).  "Termination from Employment" is defined as "separation from service" as defined within the meaning of § 409A of the Internal Revenue Code.  *See* Plan §§ 1.40; 1.38.

> calendar day revocation period has expired. Refusal to sign and return the General Release or its timely revocation shall void the Company's obligation to make any distribution of Employer Contributions to the Participant. Plan benefit payments will be provided to the terminated Participant as soon as administratively practicable subsequent to the expiration of the seven (7) calendar day revocation period.

*See* Plan § 1.24. The Plan does not specify the scope or terms of the General Release, but the foregoing provision suggests that the Plan Administrator tenders the form of the General Release to the Participant.

Mr. Gordon's employment ended in May or June 2009.[3] In an attempt to resolve disputes between them, Madison offered Mr. Gordon compensation for a specified time period, a severance payment and payment of his interest in the Plan. The addendum to the offer, dated May 5, 2009, included a General Release (the "May 5, 2009 General Release") which stated:

> Gordon forever settles, releases, compromises, reaches accord and satisfaction, waives, remises, discharges and acquits Madison, its managers, parents, successors, subsidiaries, affiliates, directors, officers, shareholders, agents and employees (collectively the "Released Entities") on each and every claim, which exists as of the Effective Date of this Agreement, whether known or unknown, as well as any claim which may hereafter arise against the Released Entities, arising out of or relating to Gordon's employment with the Company, separation from employment, or any potential claim against any of the Released Entities. This Release specifically includes, without limitation, claims for the following:

> a. Alleged violation of the following laws: The Age Discrimination In Employment Act of 1967, 29 U.S.C. 621 *et seq.*, as amended; the Older Workers Benefit Protection Act, Pub. Law 101-433, 104 Stat. 978 (1990); Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000-e, as amended; the Americans with Disabilities Act; the Civil Rights Acts of 1866, 1871, and 1991; the Family and Medical Leave Act; the Equal Pay Act of 1963; the Employee Retirement and Income Security Act; and any other federal, state, or local employment statute,

---

[3] The manner and circumstances surrounding Mr. Gordon's termination of employment are disputed, but for purposes of this matter, it is not necessary to resolve them or to determine the exact date of separation. It is sufficient to note that Mr. Gordon contends that his termination was related to his allegation that Madison had improperly paid substantial amounts to certain executives.

law or ordinance, including any and all claims of employment discrimination based on race, color, creed, religion, national origin, sex, age, marital status, disability, sexual orientation, lawful off-duty conduct, or retaliation;

b.  any and all common law claims such as wrongful discharge, violation of public policy, defamation, negligence, infliction of emotional distress, any intentional torts, outrageous conduct, interference with contract, fraud, misrepresentation, invasion of privacy, and retaliation, including retaliation and other common law claims; and

c. any and all claims for any of the following: money damages, including actual, compensatory, liquidated or punitive damages, equitable relief such as reinstatement or injunctive relief, front or back pay, wages, benefits, sick pay, vacation pay, liquidated damages, costs interest, expenses, attorneys' fees, or any other remedies.

*See* Addendum to Agreement, filed as **#32-2**, at 10–11.

The addendum advised Mr. Gordon that he had twenty-one days to sign the General Release and seven days thereafter to revoke it.  In emails dated June 4, 2009 and June 12, 2009, Mr. Gordon declined Madison's offer.  He did not sign either the agreement or the General Release.  The parties subsequently entered into a tolling agreement to allow for resolution of their dispute through mediation or other non-litigation means.

At the end of the tolling period, Mr. Gordon demanded payment of his interest in the Plan.  His October 1, 2009 demand expressly addressed the General Release.  It referred to Plan sections 5.02 and 1.24, which deal with the General Release requirement, then stated:

Mr. Gordon considers the condition precedent void to the extent any release interferes with his responsibilities as an accountant and fiduciary with respect to the investments in any fund for which Mr. Gordon had accounting responsibilities. Similarly, Mr. Gordon considers the condition precedent void to the extent any release would include claims for wrongful termination in violation of public policy. Therefore, Mr. Gordon repudiates any obligation to sign such a release as a condition precedent to a cash settlement under the Plan.

*See* Letter dated October 1, 2009, filed at **#32-7**.

The Plan Administrator denied Mr. Gordon's demand for payment under the Plan for two reasons: (i) his failure to sign a General Release; and (ii) because the employer contributions were unvested[4] on the date of separation. *See* Letter dated December 15, 2009, filed at **#32-8**. With regard to Mr Gordon's failure to sign the required release, the Plan Administrator explained:

> As you know, as a condition precedent to being eligible for cash settlement or distribution of employer contributions upon the occurrence of a termination event under the Plan, you were required to execute and return a General Release to the Plan, the Trust, and the Company within twenty-one days. See Plan §§ 1.24 and 5.02. Pursuant to Section 1.24 of the Plan, your refusal to sign and return a General Release automatically voided any obligation to make any distribution of Employer Contributions to you. As you know, the Company provided a General Release to you on May 5, 2009 for your signature pursuant to Section 1.24 of the Plan. Pursuant to your agent's correspondence dated June 4, June 12, and October 1, 2009, you have refused to sign the General Release. Twenty-one calendar days have passed since the Company provided you the General Release, and neither the Plan, the Trust, nor the Company have received a signed General Release from you as required under Section 5.02 of the Plan. As such, the Plan Administrator denies your Claim regarding any rights under the Plan because any obligations to make any distributions of Employer Contributions to you are void, based on your failure and refusal to sign the General Release.

*See id.*

Mr. Gordon initiated suit in state court against Madison and its officers. In the state court action he asserted a number of claims including breach of contract by Madison for failure to pay his interest under the Plan. Mr. Gordon also "appealed"[5] the Plan Administrator's determination arguing that (i) Madison never provided a "standalone" General Release to Mr. Gordon, instead

---

[4] Given the Court's determination of the General Release issue, explained *infra*, there is no need to address whether Mr. Gordon's interest in the Plan was vested or whether a denial of the demand letter was arbitrary or capricious based on this reason.

[5] Although the Plan uses the term "appeal," the process described in the Plan is essentially a request for reconsideration by the Plan Administrator.

only providing one in conjunction with the settlement offer, and (ii) because the General Release

requirement was void as against public policy it was effectively severed from the terms of the

Plan and, therefore, Mr. Gordon's failure to execute a General Release was not a violation of the

terms of the Plan.  *See* Letter dated February 12, 2010, filed at **#32-9**.  Mr. Gordon also

requested that the Plan Administrator recuse because he was a named defendant in the state court

lawsuit.

On March 22, 2010, the Plan Administrator declined to recuse himself and denied Mr.

Gordon's "appeal."  *See* Letter dated March 22, 2010, filed at **#182-1**.  The Plan Administrator

stated that a conflict of interest did not require recusal, but was merely a fact that would be

considered upon judicial review of his decision.  As for the merits of Mr. Gordon's arguments,

the Plan Administrator iterated his conclusion that the failure to sign a General Release voided

any right to payment under the Plan and further explained that:

> As you acknowledge in your Appeal, Sections 1.24 and 5.02 of the Plan require that
> you execute and return a General Release to the Plan, the Trust, and the Company
> within twenty-one days of your receipt of that General Release as a condition
> precedent to being eligible for cash settlement or distribution of Employer
> Contributions upon the occurrence of a termination event under the Plan.  A General
> Release is defined by Section 1.24 of the Plan as "the release and waiver that a
> Participant is required to sign as a condition for receipt of Plan benefits."  Such a
> General Release was provided to you on May 5, 2009.  Twenty-one calendar days
> passed since that date and neither the Plan, the Trust, nor the Company have received
> a signed General Release from you as required under Section 5.02 of the Plan.  You
> have indicated in your appeal that the General Release provided to you contained
> terms other than a standalone General Release. The Plan, however, does not require
> that the General Release take any particular form or be a standalone document. More
> importantly, pursuant to your agent's correspondence dated June 4, June 12, October
> 1, 2009, and again in your February 12, 2010 Appeal, you have refused to sign the
> General Release and repudiated any obligation to do so regardless of the form of
> such a General Release. Moreover, despite your statements in the Appeal, the Plan
> is not aware of any authority that relieves you of the Plan's obligation to execute a
> General Release as a condition precedent to requesting or receiving benefits under
> the Plan. You have provided no information or authority in your Appeal for the Plan

8

to consider regarding this position or substantiate your claim.  Therefore, we have not [sic] basis to believe that the Plan should not be administered and enforced in accordance with its terms.  *See id.*

## IV. Analysis

Mr. Gordon contends that he is entitled to payment of his interest under the terms of the Plan (Counterclaim 3), and that the failure to pay him benefits under the Plan upon his termination was a violation of the Colorado Wage Act (Counterclaim 4).  Madison seeks the opposite determination: (i) a declaration that Mr. Gordon is not entitled to benefits under the terms of the Plan because he failed to satisfy the General Release requirement (Claim 2); and (ii) a declaration that Mr. Gordon's claim under the Colorado Wage Act is not cognizable because ERISA preempts all state law in regard to the Plan (Claim 1).  The Court turns first to whether a claim by Mr. Gordon for payment under the Plan pursuant to the Colorado Wage Act is preempted by ERISA (Claim 1 and Counterclaim 4).

### A.    Colorado Wage Act

The Colorado Wage Act provides:

> When an interruption in the employer-employee relationship by volition of the employer occurs, the wages or compensation for labor or service earned, vested, determinable, and unpaid at the time of such discharge is due and payable immediately.

Colo. Rev. Stat. § 8-4-109(1)(a).  In Counterclaim 4, Mr. Gordon seeks payment of benefits under the Plan pursuant to the Colorado statutory law, rather than pursuant to the express terms of the Plan.  However, ERISA broadly preempts all state law claims that "relate to" an ERISA plan.  29 U.S.C. § 1144(a).[6]  Thus, the question is whether Mr. Gordon's claim is preempted.

---

[6] Section 1144(a) provides that " [ERISA] shall supersede any and all State laws insofar as they may now or hereafter relate to any [ERISA] plan".  Congress's primary purpose in

A state law claim "relates to" an ERISA plan if it has a "connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97 (1983). Although the scope of preemption is broad, it is not limitless. *See Egelhoff v. Egelhoff*, 532 U.S. 141, 147 (2001); *Willmar Elec. Serv. v. Cooke*, 212 F.3d 533, 537 (10th Cir. 2000). The Tenth Circuit has identified four categories of state law claims that are preempted by ERISA. Preempted are those claims that arise from: (i) laws regulating the type of benefits or terms of ERISA plans; (ii) laws creating reporting, disclosure, funding or vesting requirements for such plans; (iii) laws providing rules for calculating the amount of benefits to be paid under such plans; and (iv) laws and common-law rules providing remedies for misconduct growing out of the administration of such plans. *See David P. Coldesina, D.D.S., P.C., Empl. Profit Sharing Plan & Trust v. The Estat eof Greg P. Simper*, 407 F.3d 1126, 1136 (10th Cir. 2005).

Application of the Colorado Wage Act to the Plan would fall within the first category of preemption—a law that would regulate the type of benefits paid under this ERISA plan. Thus, to the extent that the Plan is governed by ERISA, Mr. Gordon's Colorado Wage Act claim is also preempted by ERISA.

Despite the clear language in the Plan stating that it is governed by ERISA,[7] Mr. Gordon

---

enacting ERISA was to protect the interests of plan beneficiaries, *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133 at 137 (1990), and in doing so, "to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government'" by creating a uniform regulatory scheme for employee benefit plans. *N.Y. State Conference of Blue Cross and Blue Sheild Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656 (1995).

[7] According to the Plan (**#32-1**), "The purpose of this Plan is to provide deferred compensation for certain key employees in consideration for their service to Madison, to induce the employees to continue their employment with Madison for the long term and to incent the performance of employees. It is intended that this plan be considered a 'top-hat plan' under the

argues that it should not be treated as an ERISA plan because it falls within § 1003(b), an exemption to ERISA's scope. *See* 29 U.S.C. § 1144(a). Subsection 1003(b)(5) exempts plans that are unfunded, "excess benefit plans" as defined in § 1002(36). Section 1002(36) defines an "excess benefit plan" as "a plan maintained by an employer solely for the purpose of providing benefits for certain employees in excess of the limitations on contributions and benefits imposed by § 415 of the Internal Revenue Code of 1986.[8]"

Mr. Gordon states that this exemption applies to the Plan because it is unfunded and its purpose is to avoid the limitations imposed by Section 415. However, he provides no evidentiary support for this contention. Madison responds that the Plan is not designed solely to avoid the section 415 limitations and, therefore, it is not an excess benefit plan.

The burden with regard to this issue is on Mr. Gordon. On the record before it, the Court cannot find that the Plan is an excess benefit plan falling outside the provisions of ERISA. Not only does the Plan expressly state that it is governed by ERISA, but in addition, Mr. Gordon does not point to any Plan provision that suggests an intent to avoid of the limitations of section 415 or to operate as an excess benefit plan. Accordingly, the Court finds that the Plan is governed by ERISA and that Mr. Gordon's Colorado Wage Act claim is preempted by ERISA.[9] This determination resolves Claim 1 and Counterclaim 4 in favor of Madison.

---

Employee Retirement Income Security Act of 1974, as amended."

[8] This tax provision sets forth certain limitations on contributions and distributions.

[9] Given this determination, there is no need to address the contention that the Colorado Wage Act, by its own terms, would not apply to the Plan.

### B.    Claims Regarding Distribution Under the Plan

The issues regarding Mr. Gordon's benefits under the Plan implicate Claim 2, Claim 3,

and Counterclaim 3.  As to these, the question is whether it was reasonable for the Plan

Administrator to deny Mr. Gordon distribution under the Plan due to his failure to execute the

General Release.[10]

### 1.    Standard of Review

Generally, when a plaintiff challenges the denial of benefits under a plan governed by

ERISA, a court reviews the administrator's decision under a *de novo* standard.  *See Firestone*

*Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  If, however, the ERISA plan gives

discretionary authority to the administrator to determine eligibility for benefits or to construe the

terms of the plan, then the Court applies the arbitrary and capricious standard.  *See Flinders v.*

*Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1189 (10th Cir. 2007).

Under such standard, a court's review is limited to determining whether the administrator's

interpretation was reasonable and made in good faith.  *See Fought v. UNUM Life Ins. Co. of Am.*,

379 F.3d 997, 1003 (10th Cir. 2004).  A court need not find that the decision was the only logical

conclusion or the best conclusion, but rather need only conclude that decision was grounded on a

reasonable basis.  *See Adamson v. UNUM Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir.

2006); *Nance v. Sun Life Assurance Co. of Canada*, 294 F.3d 1263, 1269 (10th Cir. 2002).

Furthermore, a court's review is limited to the administrative record, *i.e.*, the materials complied

by the administrator in the course of making his decision.  *See Fought*, 379 F.3d at 1003; *Nance*,

---

[10]  Claims 2 and 3 seek declarations regarding Mr. Gordon's failure to execute a General Release and are, therefore, fully resolved by such a determination.  Counterclaim 4 seeks payment under the Plan which is also resolved.

294 F.3d at 1269.

If an administrator with discretionary authority operates under a conflict of interest, the conflict of interest must be weighed in determining whether there has been an abuse of discretion. *See Firestone*, 379 F.3d at 115 (citing Restatement (Second) of Trusts § 187, Comment d (1959)); *Nance*, 294 F.3d at 1269. Conflicts of interest often are based on the plan administrator's dual role as the evaluator of demands for payment and payer of any benefits because in such a circumstance the administrator has a fiduciary duty to objectively determine demands for benefits while simultaneously having an interest to avoid paying benefits. *See Metro Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008). These are standard conflicts of interest. In addition, there can be serious, case-specific, conflicts of interest that relate to the particular plan administrator or actions taken by the administrator.

To account for a conflict of interest, the Tenth Circuit employs a "sliding scale" approach. A court applies an arbitrary and capricious standard, but weighs the conflict of interest factor in accordance with the seriousness of the conflict. *See Weber v. GE Group Life Assur. Co.*, 541 F.3d 1002, 1010–11 (10th Cir. 2008); *see also Glenn*, 554 U.S. at 117 (explaining that the conflict of interest factor should be more or less important in the court's analysis depending on the magnitude of the conflict); *Murphy v. Deloitte & Touche Group Ins. Plan*, 619 F.3d 1151, 1158 n.1 (10th Cir. 2010).

In this case, there is no dispute that the Plan terms give the Plan Administrator discretionary authority to interpret and enforce Plan terms. There is also no dispute that the Plan Administrator was operating under a conflict of interest. The seriousness of said conflict and, therefore, the weight of this factor should be given in evaluating the Plan Administrator's

13

decision, is disputed.

Madison contends that the Plan Administrator was operating only under a standard inherent conflict of interest stemming from his dual role as evaluator and payer of benefits under the Plan. Mr. Gordon, however, contends that the Plan Administrator operated under a more serious conflict of interest because he was named as a defendant in Mr. Gordon's state court lawsuit, he was one of the Madison executives that Mr. Gordon accused of receiving improper payments from Madison, and he was a partner in Madison who stood to financially benefit, both personally and in his capacity with Madison, from a denial of Mr. Gordon's demand for payment.[11]

For purposes of this determination, the Court need not determine specify the weight given to the Plan Administrator's conflict of interest, because it does not affect the Court's reasoning. Regardless of whether the conflict of interest was a standard conflict as argued by Madison, or a more serious one, as argued by Mr. Gordon, the outcome remains the same.

## 2.    The Plan Administrator's Decision

Mr. Gordon does not dispute that (1) the Plan required that he execute a General Release in order to obtain payment of his interest; (2) that a General Release was tendered to him in the form of the May 5, 2009 Addendum; and (3) he refused to sign the release, and any release that

---

[11] In his Response **(#246)** to Madison's Motion for Judgment on the Pleadings **(#184)**, Mr. Gordon makes an unsubstantiated assertion of a "serious conflict of interest" without any explanation of the nature or scope of the conflict. In the absence of explanation or a showing of extra-record information to establish the conflict of interest, the Court could find none other than that created by the Plan. *See Murphy*, 619 F.3d at 1163 (holding that although generally judicial review under ERISA is limited to the administrative record, extra-record evidence may be considered if it relates to a conflict of interest). However, Mr. Gordon has elaborated on this argument in other pleadings (*see* Defendant's Supplement to Administrative Record **(#139)**); therefore, the Court considers his argument based upon both pleadings.

contained terms to which he objected.

In Mr. Gordon's demand for payment, he contended that the Plan's requirement of that he sign a General Release was void because he did not agree with the terms proposed.[12]  In this action, he argues that the Plan Administrator's denial of payments was arbitrary and capricious because: (i) the May 5, 2009 General Release required more than the General Release specified in the Plan; and (ii) the May 5, 2009 General Release terms are void as against public policy because they would require Mr. Gordon to violate his professional obligations as a tax preparer, a certified public accountant, and a fiduciary.

The Court begins with the Plan.  The Plan unambiguously states that a General Release is a "condition precedent to the Plan's obligation to make any cash settlement."  *See* Plan § 5.02.  It further states that a participant is required to sign a General Release as a condition for receipt of Plan benefits and provides that "[r]efusal to sign and return the General Release or its timely revocation shall void the Company's obligation to make any distribution of Employer Contributions to the Participant."  *See* Plan § 1.24.  However, the Plan does not specify the form of General Release that is required.  It's terms imply, but do not state, that the Plan Administrator supplies the Participant with a General Release.  Section 1.24 of the Plan expressly provides the Participant with the opportunity to accept or reject the General Release within a specified time, and if executed, provides an additional time to revoke the General Release.

Mr. Gordon's first argument - that the May 5, 2009 terms exceed the General Release

---

[12]  He objected to undisclosed terms that he believed conflicted with his professional obligations and those requiring waiver of claims related to the termination of his employment.

required by the Plan - is entirely without merit.  The Plan is silent as to the anticipated terms of

the General Release, and presumably the specification of such terms would fall within the

general authority of the Plan Administrator.  Were there evidence of prior General Releases

executed by Participants, perhaps these would suggest appropriate terms, but no such evidence

has been proffered.  It is therefore impossible to find that the terms of May 5, 2009 General

Release are inconsistent with the Plan.

      The Court perceives that the crux of Mr. Gordon's argument is that the General Release

required by the Plan was precisely the same as the General Release discussed in negotiations

with Madison.  Mr. Gordon contends that the May 5, 2009 release was not an acceptable form of

a release under the Plan because it was not a "standalone" document and included promises that

were extraneous to a General Release of claims.[13]  Although the meaning of the phrase

"standalone document" is not quite clear, the Court understands Mr. Gordon's argument to be

that the terms of the May 5, 2009 General Release were tied to proposals in the settlement offer -

such as a severance payment, and therefore exceeded what was required under the Plan.

      The terms of the  May 5, 2009 General Release are extremely broad, and its scope may

have reflected consideration for other concessions proposed in the settlement negotiations.

---

[13]  In his appeal to the Plan Administrator, Mr. Gordon only generally stated that the
release included "other contractual promises beyond the scope of Section 5.02;" he did not
specify the extraneous promises.  In his Response (**#246**) to Madison's Motion for Judgment on
the Pleadings, he specifies that the May 5, 2009 release inappropriately included non-disclosure
and non-compete provisions.  This contention is not supported by the administrative record.  The
May 5, 2009 General Release included a statement regarding the contemplated severance
payment, an acknowledgment of paid wages, a release and waiver, and an advisement as to Mr.
Gordon's rights and obligations regarding the addendum.  It did not include a non-compete or
non-disclosure provision.  These promises were included in a separate "Non-Competition,
Confidential Information and Invention Agreement" that was executed by the parties in
December 2004.

However, because the Plan did not specify (or limit) the terms of a General Release, the fact that the May 5, 2009 General Release terms were offered as part of the negotiations between Madison and Mr. Gordon does not preclude them from also being appropriate terms under the Plan.  It is clear that Mr. Gordon knew that the May 5, 2009 General Release terms were being tendered both by Madison and by the Plan.  Given the breadth of the Plan Administrator's discretion in administering the Plan, and the absence of specific terms for the required General Release, the Court cannot conclude that the Plan Administrator's selection of terms in the May 5, 2009 General Release terms was arbitrary and capricious.

Mr. Gordon's second argument is that he was excused from execution of the May 5, 2009 General Release because its terms were void as against public policy, and as a consequence the Plan Administrator acted in an arbitrary and capricious manner in denying payment to him despite his failure to execute the tendered General Release.  This argument is unpersuasive for several reasons.

First, Mr. Gordon confuses the Plan's requirement that a General Release be executed in order to obtain payment with his objection to the terms in the May 5, 2009 General Release.  He points to no provision in the Plan that requires or allows the Plan Administrator to waive the requirement of a General Release.  In the absence of such authority, the Plan Administrator is obligated to enforce the terms of the Plan.  When Mr. Gordon refused to execute the tendered release and provided none as a substitute,[14] he failed to satisfy the Plan's requirements for

---

[14]  In lieu of execution of the May 5, 2009 General Release, Mr. Gordon might have submitted one with terms acceptable to him.  The Plan Administrator might have accepted Mr. Gordon's terms, and if not, the issue would have focused on whether the Plan Administrator (with a conflict of interest) could reject the General Release that Mr. Gordon tendered.

payment.  Regardless of the reason why Mr. Gordon chose not to execute the May 5, 2009

General Release, his failure to do so precluded payment of his interest under the Plan.

Second, Mr. Gordon's contention that he was justified in not executing the May 5, 2009

General Release because its terms violated public policy is without merit.  A requirement that a

plan participant execute a General Release as a condition precedent to receiving benefits under

an ERISA plan is generally lawful.  *See Lockheed Corp. v. Spink*, 517 U.S. 882, 893–94 (1996).

Indeed, this type of provision is one of a number of *quid pro quo* arrangements between

employer and employee that may be achieved through the use of an ERISA benefit plan.  *See id.*

The contention that Mr. Gordon would not execute a General Release because it

contained terms that are void as against public policy is curious.  From a conceptual perspective,

execution of a document with terms that are void is of no moment.  If terms in the  General

Release were void as against public policy, they could not be enforced.  *See Fed. Deposit Ins.*

*Corp. v. Am. Cas. Co.*, 843 P.2d 1285, 1289 (Colo. 1992) ("It is a long-standing principle of

contract law that a contractual provision is void if the interest in enforcing the provision is

clearly outweighed by a contrary public policy.")  Put another way, if Mr. Gordon was correct

that terms in the May 5, 2009 release were void because they were contrary to public policy, he

could not be forced to comply with them.

Focusing on the specific terms in the May 5, 2009 General Release, neither the Plan

Administrator nor the Court has been presented with sufficient information to discern or evaluate

Mr. Gordon's objections.  To the Plan Administrator, Mr. Gordon provided nothing but a

conclusory statement that the General Release would violate his duties as a fiduciary, a certified

public accountant, and a tax preparer, and a categorical rejection of any General Release that

impacted such obligations.  In this action, he states that (i) the Investment Advisers Act of 1940 prohibits any course of business which operates as a fraud upon a client and any accounting practice that is manipulative or deceptive to investors; (ii) the Internal Revenue Code prohibits tax return preparers from making any false return or preparing any document that is materially false or incorrect; and (iii) the Colorado State Board of Accountancy Rules of Professional Conduct prohibit accountants from permitting others to make false entries into an entity's financial statements or records or making any false statements of fact themselves and require accountants to maintain integrity and objectivity and ensure the accurate reporting of financial information to the public and across businesses.  Mr. Gordon does not, however, explain what obligations he has under these standards, or how a waiver of his rights against Madison or the Plan would prevent him from honoring such obligations.[15]  With such little specificity, neither the Plan Administrator nor the Court (if it was inclined), could address the allegedly troublesome provisions.

Put simply, the Plan unambiguously required execution of a General Release in order for Mr. Gordon to receive payment of his benefits as a Participant.  He refused to execute the May 5, 2009 General Release and any other release that contained terms not acceptable to him.  He did not specify the terms to which  he objected, nor tender a modified or substitute General Release

---

[15]  The only additional information Mr. Gordon presents is that accountants are required to make all concerns regarding material misrepresentations and misstatements known to the appropriate higher levels of management within the organization.  He states that the Plan Administrator demanded Mr. Gordon's silence as a condition to receiving benefits.  Because the only higher authority within Madison was the Plan Administrator, who apparently had been advised of Mr. Gordon's concerns, it is unclear how the General Release would prevent him from performing his obligations.  Indeed, he alleges that he brought his concerns to other employees within Madison and that is why he was terminated.

within the specified time period.  Thus, the Plan Administrator was left with no General Release and no reasonable understanding of what terms Mr. Gordon would accept.  Under these circumstances, the Court finds that the Plan Administrator's enforcement of  the plain language of the Plan requiring a execution of a General Release as a condition precedent to payment was not arbitrary or capricious.   The Plan Administrator was reasonable in denying Mr. Gordon payment due to his failure to timely execute and submit a General Release.

This determination resolves Claim 2 and Counterclaim 3 in favor of Madison and renders Claim 3 moot.[16]  It leaves pending Counterclaims 1, 2, 5, 6, and 7, which are based upon state law.

### C.       Pending State Law Claims

As to the state law claims, this Court exercises only supplemental jurisdiction pursuant to 28 U.S.C § 1367.   Subsection 1367(c) provides that a court may decline to exercise supplemental jurisdiction if all claims over which it had original jurisdiction have been dismissed.[17]

---

[16]  Claim 3 deals exclusively with an alternative ground on which the Plan Administrator denied Mr. Gordon's demand for payment.  As the Court has determined that the Plan Administrator acted reasonably in denying Mr. Gordon's demand for payment based on his failure to execute a General Release, it need not reach the issue of whether the Plan Administrator's reliance on this alternative ground was also reasonable.  Moreover, this also renders moot Mr. Gordon's Motion to Supplement the Administrative Record (**#245)** as the supplements he seeks to make relate only to the alternative reason.

[17]  In relevant part, the text of 28 U.S.C. § 1367 provides:
(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the

The Court declines to continue the exercise of jurisdiction over the state law based claims.  Mr. Gordon sought to have these claims determined in state court, and he initiated an action for that purpose before this matter began.  Although the parties have engaged in discovery in this action, such information is readily usable in the state action.  Having resolved all issues of federal law, and there being no showing as to why the remaining state law claims cannot be determined by the state court, they will be dismissed without prejudice.

**IT IS THEREFORE ORDERED** that

(1)       Mr. Gordon's Motion to Supplement the Administrative Record (**#245**) is **DENIED AS MOOT**.

(2)       Plaintiff/Counter-Defendant Madison Services Company, LLC's Motion for Judgment on the Pleadings (**#184**) is **GRANTED IN PART** insofar as it seeks judgment as to Claims 1 and 2 and Counterclaims 3 and 4 and **DENIED IN PART AS MOOT** insofar as it seeks a judgment on Claim 3.

(3)       Counterclaims 1, 2, 5, 6, and 7 are **DISMISSED without prejudice.**

---

joinder or intervention of additional parties.

. . .

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if--
  (1) the claim raises a novel or complex issue of State law,
  (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
  (3) the district court has dismissed all claims over which it has original jurisdiction, or
  (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

(4)     The Clerk will enter a judgment consistent with this Order.

Dated this 16th day of March,  2011

BY THE COURT:

Marcia S. Krieger
United States District Judge